United States District Court
District of Massachusetts

```
_____
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          v.                      )      Criminal No.
                                  )      08-10333-NMG
JOHN C. MENDONCA,                 )
          Defendant.              )
_____ )
```

MEMORANDUM & ORDER

GORTON, J.

Defendant John C. Mendonca ("Mendonca") is charged with conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846 (Count I) and possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) (Count II).  He has moved to suppress 1) physical evidence recovered from a search of his vehicle, 2) statements made to police during a vehicle stop and following his arrest and 3) physical evidence recovered pursuant to four search warrants.

I.  **Factual Background**

In late August, 2008, agents with the South Coast Anti-Crime Team ("SCAT"), a consortium of law enforcement officers from local police departments in Massachusetts and Rhode Island, received information from the United States Drug Enforcement Administration ("DEA") that Mendonca was trafficking marijuana in southeastern Massachusetts.  Based upon that information, SCAT agents began investigating and surveilling Mendonca through GPS

and physical surveillance.

On September 5, 2008, SCAT agent and East Providence Police Sergeant Diogo Mello ("Sergeant Mello" or "Mello") followed Mendonca to several locations: 84 McGowan Street and 206 Covel Street, both in Fall River, Massachusetts as well as 25 Bullocks Point Avenue and the Extended Stay Motel at 1000 Warren Avenue ("the Extended Stay") in East Providence, Rhode Island.  Based upon his observations and experience, Sergeant Mello suspected that at least the first two addresses were stash locations.

On the next morning, September 6, 2008, SCAT agents resumed their surveillance, following Mendonca from 25 Bullocks Point Avenue, where he had spent the night, to his mother's house in Fall River, Massachusetts.  He drove a blue Toyota Rav-4 ("the Rav-4").  Shortly before 11:00 a.m., Mendonca left his mother's residence and headed toward Interstate 195 ("I-195") and Rhode Island.  On I-195, Sergeant Mello observed him following other cars too closely, changing lanes without signaling and traveling at speeds of between 75 and 90 miles per hour in a posted 65 mile per hour zone.  In East Providence, Sergeant Mello again observed the Rav-4 following vehicles too closely and changing lanes without signaling.

The vehicle then entered the parking lot of the Extended Stay.  Mendonca parked and made two trips from the motel carrying bags and boxes that were loaded into the car.  He was checking

-2-

out and, at approximately 12:00 p.m., left the motel.

At that point, Sergeant Mello and his surveillance team decided to stop the defendant.  Mello knew that Mendonca had been arrested at or near a motel twice in possession of marijuana and large sums of cash and, therefore, believed that he might again be transporting contraband.  In an exercise of caution, however, Mello and his team decided to wait.  They determined that a field interview stop ("FI stop") by a marked police vehicle was the best way to gather basic information but still avoid compromising their investigation if it turned out that Mendonca did not have anything obviously suspicious in the car.

Accordingly, Sergeant Mello placed a telephone call to East Providence Police Officer Paul Saisselin ("Officer Saisselin" or "Saisselin"), with whom he had worked previously in a similar manner.  Mello informed Saisselin of Mendonca's earlier traffic violations and requested that Officer Saisselin perform a FI stop on the Rav-4.  Sergeant Mello asked Officer Saisselin to keep it routine and "not to heat it up".  He wanted Saisselin only to "gather intel" by, for example, learning Mendonca's origin and destination while looking out for any suspicious behavior or odors.

Officer Saisselin spotted the Rav-4 a short time later and, after the vehicle passed through a school area with heavy traffic, initiated the stop.  The Rav-4 made a sudden lane change

without signaling but then pulled over in the parking lot of the Silver Spring Golf Course. Surveillance agents observed the traffic stop from an undisclosed location. Sergeant Mello, however, was unable to watch the stop and could not contact Officer Saisselin for about ten minutes due to poor cellular telephone service in the area.

Officer Saisselin approached the vehicle and asked for Mendonca's license and registration. According to Officer Saisselin, Mendonca's arms were shaking nervously and he refused to make eye contact. When Saisselin asked Mendonca why he was traveling in East Providence, the defendant indicated that he had just moved out of the Extended Stay and was looking for a new place to live. Officer Saisselin returned to his vehicle to run a check on Mendonca's license, at which point Saisselin testified that Mendonca's abnormal behavior escalated. The defendant watched him attentively through his mirror throughout the license check. Moreover, when Saisselin returned to the Rav-4, Mendonca was still shaking uncontrollably. Saisselin called Mendonca's nervousness the worst he had seen in his 15-year career.

Based upon this behavior and his experience as a patrolman, Officer Saisselin determined that there was more to the stop than the reported traffic infractions. He could not, however, contact Sergeant Mello or his unit and therefore "took it upon [himself] to continue with the investigation as to why Mendonca was so

-4-

nervous." First, despite the defendant's compliance up to that time, Mendonca's behavior left Saisselin concerned for his safety. Therefore, he asked Mendonca to step out of the vehicle and frisked him but did not find any weapons.

Saisselin's focus then turned to the Rav-4's contents. Mendonca had previously told Saisselin that his nervousness was not related to his carrying any contraband but he did admit that there was a bottle of his mother's prescription pills in the car. Saisselin nonetheless asked Mendonca if he could search the vehicle and, according to Saisselin's testimony and sworn affidavit, Mendonca consented.

Saisselin therefore proceeded with the search while Mendonca stood in front of the Rav-4 with another officer who had arrived on the scene to assist. Although the majority of the vehicle's contents were, consistent with Mendonca's account, clothes, food and other items expected of anyone moving out of a motel, Officer Saisselin also recovered the reported Percocet/Oxycodone pills prescribed to Mendonca's mother, several cell phones, drug paraphernalia, a substance suspected to be anabolic steroids and cash.

Officer Saisselin relayed his findings to Sergeant Mello and his team who, by now, had regained communication. A canine was summoned but did not detect any additional contraband. Saisselin placed Mendonca under arrest for possession of a controlled

-5-

substance and issued citations to him for the traffic violations.

The remainder of the events transpired somewhat routinely. Mendonca was transported to the East Providence police station where he signed a written acknowledgment and waiver of his <u>Miranda</u> rights.  During the ensuing interrogation, Mendonca admitted that he had resumed trafficking marijuana and identified three locations as central to his activities: 84 McGowan Street and 206 Covel Street, both in Fall River, Massachusetts and 25 Bullocks Point Avenue in East Providence, Rhode Island.  Based upon these statements and preceding events, officers obtained and executed search warrants of the above addresses and of the Rav-4. As Mendonca had indicated, officers found several hundred pounds of marijuana, a money counting machine and a substantial amount of cash at the searched premises.

## II.  **Procedural History**

Mendonca was indicted on November 5, 2008.  On August 13, 2009 he filed the pending motions to suppress and, after receiving an extension of time, the government filed its opposition on October 2, 2009.  Evidentiary hearings were held on Tuesday, November 24, 2009 and on Wednesday, December 16, 2009, and at the Court's invitation, the parties submitted supplemental memoranda between and after those hearings.

## III. **Analysis**

In evaluating Mendonca's motions to suppress, the Court

scrutinizes separately each step of the interaction between the police and the defendant.  For each stage, the Court must determine whether the step was justified by the information known to officers at that time.  E.g., United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).  Here, Mendonca advances a three-part rationale for suppression: 1) the initial stop of the vehicle was unsupported by either probable cause or reasonable suspicion, 2) there were no valid grounds for his continued detention at the scene where the vehicle was searched and 3) all statements and evidence that were subsequently recovered flow from the tainted vehicle stop and search and therefore must be suppressed.  The Court addresses each contention in turn.

**A.   The Initial Stop**

The Fourth Amendment guarantees each citizen the right to be free from unreasonable searches and seizures.  The detention of individuals during an automobile stop by police, even if limited in duration and purpose, is a "seizure" subject to the constitutional imperative of reasonableness.  Delaware v. Prouse, 440 U.S. 648, 653 (1979).  The government bears the burden of proving that a warrantless stop of a vehicle was justified and reasonable.  E.g., United States v. Ramos-Morales, 981 F.2d 625, 628 (1st Cir. 1992).

In this case, the government contends that the initial stop was justified because 1) Officer Saisselin had probable cause to

believe that the defendant had committed traffic violations and 2) the officers involved had reasonable suspicion to believe that Mendonca may be engaged in criminal activity.

### 1. Traffic Violations

A vehicle stop is generally reasonable if "the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996).  Reasonableness does not depend upon subjective intentions and the fact that a traffic violation operates as a pretext for stopping motorists about whom the police harbor unrelated suspicions plays no role in the constitutional analysis.  Id. at 813.

The government contends that the vehicle stop was permissible based upon the traffic violations observed by Sergeant Mello and relayed to Officer Saisselin.  It argues that postponing the stop for roughly one hour "was not unreasonable" in light of the totality of the circumstances, including ongoing surveillance and Mendonca's arrest history.  The government also cites two cases upholding a traffic stop as reasonable where officers delayed between the infraction and the stop.  See United States v. Henderson, 229 F. Supp. 2d 35, 37 (D. Mass. 2002); State v. McComb, No. 21963, 2008 WL 314906, at *1-2 (Ohio Ct. App. Feb. 1, 2008).

The government's argument is unpersuasive and, accordingly, the stop will not be upheld based upon the traffic violations.

In short, the government has not satisfied the Court that the lengthy delay between the infractions and the stop was reasonable or permissible.  Cited cases are all clearly distinguishable because in none did the hiatus approach the duration of the delay here (one hour) nor, in any of those cases, did the defendant park and load suspicious packages into the vehicle in the meantime.  Although a slight delay to gain a tactical advantage is entirely reasonable, see also United States v. Scopo, 19 F.3d 777, 779-80, 782 (2d Cir. 1994); United States v. Sweeney, No. 07-cr-400, 2007 WL 4522237, at *5 (N.D. Ohio Dec. 18, 2007), no such tactics were necessary here where Mendonca 1) was driving in broad daylight, 2) in a relatively safe area and 3) parked of his own volition.

Here, the obvious rationale for the stop was to inspect what Mello and his team thought to be suspicious activity at the Extended Stay.  Although pretextual stops based upon traffic infractions are generally permissible, see Whren, 517 U.S. at 513, the government has failed to justify the stop on such grounds here.  In sum, a completed traffic misdemeanor cannot hang over a suspect indefinitely until a time at which he has engaged in some other suspicious activity that officers believe warrants a pretextual stop.

-9-

### 2.   Reasonable Suspicion of Criminal Activity

#### a.   Legal Standard

Even without probable cause to make an arrest, police officers may conduct a brief investigatory stop for the purposes of crime prevention and detection.  Terry v. Ohio, 392 U.S. 1, 22 (1968).  Such encounters are justified if the officer has "reasonable, articulable suspicion that criminal activity is afoot."  United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004).  In making a reasonable-suspicion determination, a court

> must look at the "totality of the circumstances" ... to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.... [O]fficers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.

United States v. Arvizu, 534 U.S. 266, 273 (2002) (citations omitted).  Although an officer must rely on more than a hunch, the likelihood of criminal activity "need not rise to the level required for probable cause...."  Id.

To justify a stop in the context of an investigation, moreover, an officer may rely on the collective or pooled knowledge of other officers.  Knowledge can be imputed to an officer acting "in accordance with the direction of another officer who has reasonable suspicion."  United States v. Barnes, 506 F.3d 58, 63 (1st Cir. 2007).

-10-

### b.   Application

The government contends here that 1) Mello and his team possessed reasonable suspicion that Mendonca was engaged in criminal activity and 2) their knowledge can be imputed to Saisselin under the collective knowledge doctrine.

Mendonca focuses his response on what all of the officers knew, even assuming that such facts could be imputed to Saisselin.  Mendonca contends that the aggregate knowledge "sums up to little more than speculation and not more than a hunch".  According to Mendonca, the police possessed only "some developing intelligence" insufficient to justify an investigatory stop.

The Court disagrees and finds that the government has met its burden of proof.  The analysis proceeds in two steps.  First, the Court determines whether the knowledge possessed by Mello and his team could support a reasonable suspicion to stop Mendonca.  The following were among the facts known to Mello on September 6, 2008: 1) a DEA agent reported that Mendonca had resumed large-scale trafficking, 2) Mendonca was seen at several suspected stash houses the day before, 3) he had loaded cargo into his car and 4) Mendonca had been arrested twice with contraband at or near a hotel.  In light of those facts and the ongoing investigation, Mello sought an investigatory stop to gather additional information about Mendonca.  The Court finds that he was justified in doing so.

Mendonca's contention that Mello had no more than an impermissible hunch is unpersuasive.  Mendonca points to Mello's refusal to testify that he was certain that Mendonca had contraband in the car, instead simply repeating that it was possible.  That point is unavailing, however, because the law does not require certainty before an investigatory stop is permitted.  Instead, Mello's testimony about his awareness of the above facts was sufficient to support a reasonable suspicion of criminal activity and a traffic stop to investigate that suspicion.

Having found that Sergeant Mello possessed reasonable suspicion, the Court determines whether all of the information known to Mello and his team can be imputed to Saisselin.  Because Saisselin acted "in accordance with the direction of [Mello]", the Court finds that it can be.  Barnes, 506 F.3d at 63.  See also United States v. Rodriquez, 831 F.2d 162 (7th Cir. 1987) (holding that state trooper was acting as an extension of the DEA in responding to a request for a routine traffic stop where the vehicle was specified and where the trooper knew that the requesting officer was coordinating a large investigation).

Two complicating factors do not alter this conclusion.  First, the fact that, at the time of the stop, the officers sought to justify it based upon traffic violations rather than reasonable suspicion of criminal activity is not dispositive.

See, e.g., United States v. Ramirez, 473 F.3d 1026, 1030-31 (9th Cir. 2007) ("[T]he fact that officers acted on one rationale would not foreclose the government from justifying the search by proving [another].") (quotations and citations omitted).  Indeed, Mello desired an investigatory FI stop and that is precisely what occurred.  The fact that he called in the request based upon aging traffic violations does not divest the stop of its valid justification.  Cf. Whren, 517 U.S. at 513.

Nor is it critical that Mello told Saisselin nothing whatsoever about the ongoing drug investigation in his request. Even without Mello stating as much, Saisselin suspected that Mendonca was the subject of such an investigation.  Saisselin testified that he had worked with Mello previously in a similar role, that he knew Mello worked for a unit responsible for drug investigations and that he therefore (correctly) suspected that there was more to the stop than traffic infractions.  That modicum of knowledge was all that the stopping officer possessed in Rodriguez.  831 F.2d at 165-66.

Moreover, whether or not Saisselin knew generally that a drug investigation was ongoing does not affect the applicability of the collective knowledge doctrine.  That doctrine applies only where the stopping or arresting officer is unaware of sufficient particularized facts to justify a stop or arrest and, therefore, must retrieve such facts from the communicating officer by

imputation.  As such, had Mello told Saisselin explicitly that

Mendonca was under investigation for narcotics,

> such information would not have brought [him] any closer
> to independently knowing facts sufficient to constitute
> [reasonable suspicion.  The Court] would still have to
> impute facts known only to [Mello] and his team.

Ramirez, 473 F.3d at 1031-37 (rejecting defendant's proposed

"minimal communication" limit to collective knowledge doctrine).

Accordingly, the Court finds that 1) Sergeant Mello and his

team had a reasonable suspicion that criminal activity may be

afoot to justify an investigatory stop and 2) their suspicions

were imputed to Officer Saisselin who effectuated the vehicle

stop.  The initial stop, therefore, was permissible.

**B.   Scope of the Stop**

A traffic stop is not necessarily limited to its initial

scope.  It is an ongoing process and "the propriety of an

officer's actions after an initial stop depends on what the

officer knows (or has reason to believe) and how events unfold."

United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008)

(quoting Romain, 393 F.3d at 71).  If a stop is justified at its

inception, the Court must consider whether subsequent actions

> were fairly responsive to the emerging tableau—the
> circumstances originally warranting the stop, informed by
> what occurred, and what the officer learned, as the stop
> progressed.

Chhien, 266 F.3d at 6.

Here, Mendonca contests the scope of the stop and his

accompanying detention.  Although he does not elaborate in his filings, cross examination during the evidentiary hearing sought to establish that Officer Saisselin had no reason to question Mendonca about drug activities and had no basis for detaining him at length, for frisking him or for searching the vehicle.

### 1.   Questioning

An officer may "make reasonable inquiries of the suspect designed to confirm or dispel his suspicions." United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000).  Moreover, an officer "may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." Chhien, 266 F.3d at 6.

Mendonca contends that Officer Saisselin's questioning had "nothing to do with [Mendonca's] driving or the issuance of a citation" and was therefore inappropriate.  The Court disagrees. As the government asserts, Officer Saisselin was justified in asking routine questions about Mendonca's itinerary, even if they were not directly related to the traffic violations that induced the stop.  E.g., United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009) (holding that such questioning "does not escalate the stop beyond the scope of an investigative stop").

Furthermore, subsequent questioning about drug activity or the vehicle's contents was a permissible response to unfolding events.  Officer Saisselin testified that from the moment he

approached the vehicle, Mendonca was extremely nervous, a state
which deteriorated to what Saisselin called the worst he had ever
seen.  That behavior led Saisselin to ask Mendonca 1) why he was
so nervous (to which Mendonca responded that it was because he
had recently been stopped) and 2) when he had last been arrested
(to which he responded 2002 for narcotics).  Based upon those
answers and Saisselin's observations, the focus of his
questioning justifiably changed.  He queried Mendonca, for
instance, as to whether there was anything illegal in the car
causing Mendonca's nervousness.  The Court finds that this
progression from identity and itinerary to drugs was well within
Saisselin's authority under the circumstances of his growing
suspicions.  See Woodrum, 202 F.3d at 6; Chhien, 266 F.3d at 6.

### 2.   Removal from the Vehicle and Frisk

Mendonca also appears to object to being asked to get out of
his vehicle and to being pat-frisked.  If an officer becomes
concerned for his safety during the course of a stop, he may
order the driver out of the car for security.  Pennsylvania v.
Mimms, 434 U.S. 106, 109-11 (1977).  Such an order may be given
"as a matter of course; [the officer] does not need to have an
independent fear for his safety."  Ruidiaz, 529 F.3d at 32
(emphasis in original).

A pat-frisk for weapons is also permissible if an officer
justifiably believes a suspect may be armed and dangerous.  The

lawfulness of a frisk is judged by the totality of the
circumstances giving rise to an officer's suspicion.  United
States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005) (citations
omitted).  In Gilliard, the First Circuit held that

> [because] firearms are "tools of the trade" [in narcotics
> trafficking], a very well-founded suspicion of drug
> activity ..., coupled with [defendant's] nervous
> behavior, gave rise to a legitimate and specific concern
> for personal safety.

United States v. Gilliard, 847 F.2d 21, 25 (1st Cir. 1988).

In this case, the Court finds that Saisselin was justified
in asking Mendonca to step out of the vehicle and in frisking
him.  To be sure, not all of the facts indicated danger.
Mendonca was, for example, generally cooperative and kept his
hands on the steering wheel.  Nonetheless, the Court considers
two factors to be crucial, neither of which is directly refuted.
First, Saisselin and Mello were suspicious of large-scale drug
trafficking, a trade associated with weapons.  Second, Saisselin
characterized Mendonca's nervous behavior as the worst he had
ever seen, well beyond typical and expected nervousness during a
traffic stop.  This led Saisselin to believe that a pat-frisk for
weapons was appropriate and the Court concludes that his judgment
in that respect was reasonable.  See id.

### 3.  Vehicle Search

#### a.  Legal Standard

A search conducted pursuant to valid consent is

constitutionally permissible even in the absence of a warrant or probable cause.  Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  The government bears the burden of proving, by a preponderance of the evidence, that the defendant gave his consent freely and voluntarily.  Id.

Voluntariness is a question of fact that turns on the totality of the circumstances.  Id. at 227.  Among the relevant factors are knowledge of the right to withhold consent and whether permission was obtained by coercive means or under inherently coercive circumstances.  United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999).

### b.  Application

Officer Saisselin submitted an affidavit and testified that Mendonca gave consent to search the vehicle following the pat-frisk.  Mendonca rebuts the government's proof by 1) submitting an affidavit asserting that the search was conducted without his consent and 2) seeking, at the evidentiary hearing, to cast doubt on Saisselin's testimony.  For example, Mendonca's counsel questioned Saisselin about his decision to exceed Mello's instructions and to take it upon himself to continue the investigation into Mendonca's nervousness by searching the vehicle.

The Court credits Saisselin's in-court testimony and affidavit over Mendonca's affidavit.  See United States v.

Landan, No. 07-cr-10407 (NMG), 2009 WL 3834025, at *3 (D. Mass. Nov. 12, 2009).  Moreover, the Court declines to read any subtext into Saisselin's testimony.  Simply put, Saisselin's decision to proceed beyond Mello's initial request is insufficient to support an inference that he fabricated Mendonca's consent as an ex post justification or for any other reason.  Accordingly, the Court finds that, by a preponderance of the evidence, the government has shown that Mendonca gave his consent to search the vehicle.

That does not, however, end the inquiry because Mendonca contends that, even if the Court finds that he consented to the search, it was involuntary and inherently coerced.  His contention is unpersuasive.  The fact that he was ordered out of the car and pat-frisked before being asked to provide consent is not inherently coercive.  See Dunbar, 553 F.3d at 57.  Nor can Mendonca plead ignorance about his right to refuse consent or the consequences of giving consent because he has an extensive criminal history and experience with searches and seizures.[1]  See Forbes, 181 F.3d at 5.  Finally, Mendonca contends that because neither probable cause nor reasonable suspicion existed for the stop, "any alleged consent to search was preceded by a Fourth Amendment violation ... and was not voluntary in fact."  Because

---

[1] The government states that Mendonca and his wife were indicted in 2003 on 72 counts of conspiracy to distribute over 100 kilograms of marijuana, money laundering and structuring.  He was arrested twice in 2002 and DEA agents seized several million dollars in cash, several pounds of marijuana and a gun.

the Court has found no preceding constitutional violation, however, this argument fails.  Thus, the Court finds that Mendonca's consent was not unconstitutionally coerced.

### D.   Post-Arrest Statements and Warrants

The defendant finally moves to suppress statements made during his post-arrest interrogation (in which he revealed the principal locations of his trafficking activities) as well as the product of the search warrants that emanated from those statements.  He contends that his statements must be suppressed because his arrest was the product of an illegal search and that the statements were not sufficiently an act of free will or attenuated from the illegal search to be purged of the primary taint.

In light of the Court's findings herein, Mendonca's motions with respect to his post-arrest conduct will also be denied.  The vehicle stop, search and arrest were justified and, therefore, no "taint" existed that might infect Mendonca's post-arrest statements.  There is, moreover, no evidence of any other coercion during interrogation and Mendonca makes no such argument.  As such, the statements will not be suppressed and the search warrants based upon those statements were proper.

## ORDER

In accordance with the foregoing, defendant's motions to suppress (Docket Nos. 34, 36, 38, 40, 42 and 44) are **DENIED**.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated February 3, 2010